Not for Publication

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| MATTIE HALLEY, SHEM ONDITI, LETICIA MALAVÉ, and SERGIO de la CRUZ, | : | |
| | : | |
| On Behalf of Themselves and All Others Similarly Situated, | : | |
| | : | Civil Action No. 10-3345 (ES) (JAD) |
| Plaintiffs, | : | |
| | : | OPINION |
| v. | : | |
| | : | |
| HONEYWELL INTERNATIONAL, INC. and PPG INDUSTRIES, INC., | : | |
| | : | |
| Defendants. | : | |

**SALAS, DISTRICT JUDGE**

This case involves the alleged environmental contamination of certain properties in Jersey City, New Jersey. Pending before the Court are two motions: (1) a joint motion for final approval of a settlement between two of three classes of Plaintiffs and one of two Defendants, Honeywell International Inc., (D.E. No. 415); and (2) Settlement Class Counsel's motion seeking an award of reasonable costs, attorneys' fees, and incentive awards, (D.E. No. 397). The Court has received objections from individuals associated with three of the 3,497 identified properties. (D.E. Nos. 398, 406, 410 & 417).

On September 24, 2015, the Court held a Fairness Hearing. After the Hearing, the Court requested—and the parties submitted—certain supplemental submissions in connection with the pending motions. (*See* D.E. Nos. 428, 430-36).

For the reasons in this Opinion, the Court certifies the two classes for purposes of settlement, grants final approval of the proposed settlement, and awards costs, attorneys' fees, and incentive awards.

## I.  FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs allege that Honeywell International Inc. ("Honeywell") and PPG Industries, Inc. ("PPG") (collectively, "Defendants") are responsible for the "wrongful emission, release, discharge, handling, storage, transportation, processing, and disposal of their toxic and hazardous manufacturing by-product Chromium Ore Processing Residue ('COPR') in Jersey City, New Jersey" and/or failed to "identify, remove and/or properly remediate hexavalent chromium, COPR and related chromium contamination produced and created at their respective manufacturing facilities."  (D.E. No. 391 ("6th Am. Compl.") ¶ 1).

In particular, Plaintiffs allege that Defendants "created and dumped over one million tons of waste materials, including COPR, which contains hexavalent chromium and other toxic metals"—and that, in turn, these "hazardous waste materials released airborne matter that scattered so that persons and properties in Jersey City were, and, continue to be exposed to hazardous materials."  (*Id.* ¶¶ 2, 3).  The alleged "waste materials have been and continue to be a source of hazardous substance emissions onto, within and surrounding properties and persons in Jersey City."  (*Id.* ¶ 4).  Allegedly, "[l]arge amounts of hexavalent chromium, COPR and related chromium contamination remain today in Jersey City."  (*Id.* ¶ 7).

So, the properties have allegedly been impacted by the COPR and related chemical contaminants.  (D.E. No. 415-3 at 1-2).  In particular, Plaintiffs allege that COPR "migrated" from the following two Jersey City manufacturing facilities: (1) a facility on Route 440 that was operated by the Mutual Chemical Company ("Mutual") from 1895 to 1954 (for which

Honeywell is the corporate successor); and (2) a facility located on 880 Garfield Avenue that was operated by the Natural Products Refining Company and Pittsburgh Plate and Glass Company from 1924 to 1963 (PPG is the corporate successor).  (*Id.* at 2).  Defendants were allegedly the "only generators of COPR within Jersey City, New Jersey."  (6th Am. Compl. ¶ 20).

Plaintiffs "own or owned properties in Jersey City, New Jersey" and are grouped in three classes—Classes A, B & C—depending on where the property is located.  (*See id.* ¶¶ 11-15, 73). Thus, there are three classes of property-owners: Class A (plaintiff Shem Onditi is the class representative), Class B (plaintiffs Leticia Malavé and Mattie Halley are the class representatives), and Class C (plaintiff Sergio de la Cruz[1] is the class representative).  The pending joint motion for final approval of class action settlement concerns—with limited exception—Classes A and C.  (D.E. No. 415-1 ("Parties' Joint Motion") at 2-3, 5-6).

Briefly, Class A covers an area near the former Mutual facility (the "Mutual plant") and near certain properties on which COPR was disposed of—the latter of which is referred to by the parties as the "Mutual Sites."  (*Id.* at 2, 6).[2]  Class C covers a residential development known as

---

[1] In April 2015, Sergio de la Cruz unexpectedly died.  On September 2, 2015, the Superior Court of N.J. (Chancery Division-Hudson County, Probate Part) appointed Gilbert de la Cruz (Sergio's brother) as a Temporary Administrator for the Estate of Sergio de la Cruz.  In that capacity, the Superior Court ordered that Gilbert de la Cruz have the power to execute "any and all documents, pleadings and settlement agreements in connection with the matter of <u>Halley, et al. v. Honeywell International, Inc. et al.</u>, 2:10-cv-3345 (ES)(JAD)."  (D.E. No. 416-2 at 4). Magistrate Judge Dickson granted Plaintiffs' motion—which was made on consent—to substitute the Temporary Administrator of the Estate of Sergio de la Cruz as a Plaintiff under FRCP 25(a)(1).  (D.E. No. 418).

[2] More specifically, Class A is defined as those persons—excluding any governmental agencies or governmental actors—who "owned or own real property identified as Class 2 Residential Property (1-4 Family)" that is "generally bounded by Kellogg Street between the Hackensack River and Society Hill Drive North; Society Hill Drive North between Kellogg Street and Danforth Avenue; Danforth Avenue between Society Hill Drive North and John F. Kennedy Boulevard West; John F. Kennedy Boulevard West between Danforth Avenue and Claremont Avenue; Claremont Avenue between Route 440 and John F. Kennedy Boulevard West; Route 440 between Claremont Avenue and Culver Avenue; and from the intersection of Culver Avenue and Route 440 continuing Northwest to the Hackensack River"—and this class "includes properties located on both sides of the boundary streets contained in the class definition."  (D.E. No. 415-3 at 7-8).

Society Hill, located to the West of Class A.  (*Id.* at 6).[3]  The class ownership period for Classes A and C is "May 17, 2010 up to and including October 1, 2014."  (D.E. No. 415-3 at 6).

The class representatives allege the following five causes of action on behalf of themselves and the three classes of property owners: Private Nuisance (6th Am. Compl., Count I at 22); Strict Liability (6th Am. Compl., Count II at 26); Trespass (6th Am. Compl., Count III at 30); Negligence (6th Am. Compl., Count IV at 33); and Civil Conspiracy (6th Am. Compl., Count V at 36).  The relief sought includes: (1) "a judgment in favor of Plaintiffs Onditi and de la Cruz and the Members of Classes A and C against Honeywell for loss of property value, and for all other relief, in an amount to be proven at trial, as to which they may be entitled, including interest, expert fees and costs of this suit"; and (2) "an injunction requiring Honeywell to promptly and completely remove all hexavalent chromium, COPR and related contaminants from the properties of Onditi and de la Cruz, the properties of the Members of Classes A and C, and from Disposal Area A."  (6th Am. Compl. at 40 ¶¶ B & D).

Notably, however, there are no personal or bodily injury causes of action in the operative complaint.  (*See generally* 6th Am. Compl.).  And Plaintiffs have withdrawn medical monitoring claims relating to hexavalent chromium exposure.  (*See, e.g.*, D.E. No. 1-1, Original Complaint, ¶ 60 ("Plaintiffs and the members of the classes seek redress and damages for: economic losses, such loss of property value; *costs of medical monitoring*, punitive damages and other damages as the result of the carelessness, recklessness, negligence and willful and want violation of law by the Defendants.") (emphasis added)).

---

[3] More specifically, Class C is defined as those persons—excluding any governmental agencies or governmental actors—who "owned or own residential real property identified as Class 2 Residential Property (1-4 Family)" that is "generally comprised of the residential development known as 'Society Hill,' which includes the area known as 'Droyers Point' within that community, and is generally bounded by Lee Court, Willow Street and Cottonwood Street to the West, Cherry Street to the South, Society Hill Drive North and Kellogg Street to the Easy and Lyon Court to the North—and this class "includes properties located on both sides of the boundary streets contained in the class definition."  (D.E. No. 415-3 at 8-9).

In July 2014, Plaintiffs and Honeywell informed the Court that they had reached a settlement agreement. (D.E. No. 350). On November 7, 2014, Counsel for Plaintiffs ("Settlement Class Counsel") and Honeywell moved for preliminary approval of the class action settlement that, "[w]ith limited exception . . . resolves claims by owners of residential property within Class A and Class C" against Honeywell. (D.E. No. 367-1 at 4). This Court granted the motion, which effectuated the following: (1) certification of two settlement classes for settlement purposes; (2) preliminarily approval of the class settlement; (3) appointment of settlement class counsel; (4) appointment of a Claims Administrator[4]; and (5) approval of forms and procedures for class notice. (*See* D.E. No. 390).

Thereafter, the Court received three objections. Hugh Brown and Richard Westby-Gibson jointly filed a written objection (dated June 8, 2015) concerning their co-owned property. (D.E. No. 398). Holly Marenna-Hurley filed a written objection (dated July 27, 2015). (D.E. No. 410). Lastly, Maureen Chandra filed a written objection (dated July 31, 2015). (D.E. No. 406). On September 15, 2015, Ms. Chandra also filed a brief opposing the joint motion for final approval of class settlement. (D.E. No. 417). Both Honeywell and Settlement Class Counsel responded to Ms. Chandra's objections. (*See, e.g.*, D.E. Nos. 419 & 425).

On September 25, 2015, the Court held a Fairness Hearing pursuant to Federal Rule of Civil Procedure 23(e)(2). At the Fairness Hearing, no objectors—except for Ms. Chandra through her counsel—appeared.

## II. THE PROPOSED SETTLEMENT

The proposed Settlement Agreement provides a $10,017,000.00 non-reversionary settlement fund—i.e., one in which Honeywell will not recoup any unclaimed money—for residential property owners in Classes A and C. (*See, e.g.*, D.E. No. 415-3 at 9, 14). The Claims

---

[4] Garden City Group, LLC was the approved Claims Administrator. (D.E. No. 390 at 6; D.E. No. 435 at 1 n.1).

Administrator identified a combined 3,497 properties in connection with Classes A and C.  (D.E. No. 415-4 ¶ 17).  With limited exception, the proposed Settlement Agreement does not resolve claims against PPG and does not involve Class B members residing near the former PPG plant. (*See* D.E. No. 415-3 at 7-8).

From the $10,017,000.00 settlement fund, initially the parties proposed $6,101,575.33 would be available for distribution to members from Classes A and C because certain distributions would be withdrawn for attorneys' fees, attorneys' costs, incentive awards for the class representatives, and administration expenses, as follows:

| Settlement Fund | $10,017,000.00 |
|---|---|
| Attorney's Fees | $2,504,250.00 |
| Attorneys' Costs | $1,191,174.67 |
| Incentive Awards ($10,000 to Each Settlement Class Representative) | $20,000.00 |
| Approximate Claims Administration Expenses | $200,000.00 |
| Settlement Class Funds | $6,101,575.33 |

(Parties' Joint Motion at 7).

As noted, a combined 3,497 properties from Classes A and C have been identified.  As of September 3, 2015 (which is when the parties' joint motion for final approval was filed), 2,217 valid claims had been submitted for 2,085 of the 3,497 properties.  (D.E. No. 415-4 ¶ 16).  This equates to nearly 60% of all eligible class properties.  (*Id.* ¶ 17).  Accordingly, the allocation per property would be:

- 6 -

| Settlement Class Funds | $6,101,575 |
|---|---|
| Class Properties | 3,497 |
| Allocation per Property | $1,745 |
| Number of Properties for Which Valid Claims Have Been Filed | 2,085 |
| Claimed Funds | $3,637,914 |
| Unclaimed Funds | $2,463,662 |
| Final Allocation Per Property | $2,926 |

(Parties' Joint Motion at 8).

After September 3, 2015, however, the Claims Administrator "received 15 additional claims," resulting in 2,232 valid claims being submitted for 2,089 of the 3,497 properties.  (D.E. No. 435 ¶ 8 & ¶ 8 n.3).  Furthermore, the requested costs have been reduced from $1,191,174.67 to $1,140,023.77.   (D.E. No. 431).   The Claims Administrator, however, submitted administration expenses of $219,278.87, which is slightly more than the initially estimated $200,000 noted above.  (*See* D.E. No. 435 at 12).   This leaves $6,133,447.36 as the Net Settlement Fund for 2,089 properties—i.e., $2,936.07 per property.  (*See* D.E. No. 432 at 6 n.5).

If approved by the Court, the Claims Administrator intends to "mail checks to all Class Members for their *pro rata* share of the Net Settlement Fund," which will be "based on a time-weighted *pro rata* amount of the share allocated for that property" as provided by the Settlement.  (D.E. No. 435 ¶ 10; *see also* D.E. No. 415-3 at 14).

As of the date of this Opinion, there are twenty-eight opt-out requests, as well as the three objections noted above.  (*See* D.E. Nos. 398, 406, 410, 415-4 ¶ 18 & 417).

## III.  THE OBJECTORS' ARGUMENTS

### A.  Hugh Brown and Richard Westby-Gibson

Hugh Brown and Richard Westby-Gibson jointly submitted an objection dated June 8, 2015.  (D.E. No. 398).  Mr. Brown has owned and resided at a property within the Class C boundaries from October 26, 2007 to the date of the objection.  (*Id.* at 1).  Mr. Westby-Gibson has "co-owned and resided" at this property from July 26, 2011 to the date of the objection. (*Id.*).  Both individuals signed the objection.  (*Id.* at 2).

Briefly, the objection concerns the method of allocation under the settlement—i.e., that settlement payments would be apportioned to multiple property owners based on the length of property ownership.  In particular, the objection states that: "It stands to reason that the case of Mattie Halley, et al versus Honeywell International, Inc. et al is being brought because there may be possible unknown detriment to the health of persons living in the vicinity of historical 'chromium sites.'"  (*Id.* at 2).  The objection asserts that, "[s]ince a person's health is an individual entity (and not something that can be quantified or divided)[,] allocating settlements amounts [sic] based [on] the premise that [it] is a single property is untenable and unfair."  (*Id.*).

### B.  Holly Marenna-Hurley

Holly Marenna-Hurly submitted an objection dated July 27, 2015.  (D.E. No. 410).  Ms. Marenna-Hurly contends that she "could not afford to sue Honeywell for chromium contamination of [her] property," but that "it is difficult to accept a settlement of approximately $1,800" in exchange for her "property's worth and devaluation."  (*Id.*).  Ms. Marenna-Hurly says that she "feel[s]" her "hands are tied."  (*Id.*).  Further, she avers that "there is potentially serious health risks as a result of chromium contamination just being in the location near the chrome [sic] ore processing plant."  (*Id.*).

- 8 -

### C. Maureen Chandra

In both written submissions and at the Fairness Hearing, Ms. Chandra objects on several grounds. On July 31, 2015, Ms. Chandra filed an objection in response to the preliminarily approved settlement. (D.E. No. 406). On September 15, 2015, Ms. Chandra again filed an objection in response to the joint motion for final approval of class action settlement. (D.E. No. 417).

In that September 15 submission, she raises at least the following three arguments: (1) the Court has insufficient information to decide whether the proposed settlement is fair, reasonable, and adequate because there is no information concerning soil or ground water contamination in the class members' properties, (*id.* at 2-3); (2) releasing "unknown and unforeseen" future claims is improper, (*id.* at 5); and (3) although the Court must "evaluate the settlement in light of the best possible recovery," Settlement Class Counsel has "refused to provide the Court with an estimate of the best possible recovery," (*id.* at 4).[5]

Ms. Chandra asks the Court to

> either (1) postpone a fairness, reasonableness, and adequacy determination until it has the necessary information; or, (2) strike the release of claims for contamination and remediation due to hexavalent chromium or other chemical contamination in soil and groundwater, by using the court's equitable powers and the parties consent in the Settlement Agreement allowing the court to "incorporate any other provisions as the Court deems necessary and just."

(*Id.* at 2). Ms. Chandra also objects to Settlement Class Counsel's motion seeking an award of reasonable costs, attorneys' fees, and incentive awards. (D.E. No. 407).

---

[5] Ms. Chandra agrees that "Honeywell and [Settlement] Class Counsel have resolved Maureen Chandra's *cy pres* objection by foregoing a *cy pres* community project and instead, agreeing to distribute 'unclaimed funds' directly to class members." (D.E. No. 417 at 1; *see also* 9/24/15 Tr. at 16:25-18:5, 63:17-64:17). The Court notes that additional objections raised by Ms. Chandra, for example at the Fairness Hearing, are recited and addressed where relevant in this Opinion.

## IV.  LEGAL STANDARD

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class may be settled . . . only with the court's approval."  "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court."  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions ("In re Prudential")*, 148 F.3d 283, 299 (3d Cir. 1998) (quoting *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975)).

The "law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig. ("GM Truck Prods.")*, 55 F.3d 768, 784 (3d Cir. 1995).  Nevertheless, "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements."  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 592-93 (3d Cir. 2010); *see also In re Pet Food Prods. Liab. Litig. ("In re Pet Food")*, 629 F.3d 333, 349 (3d Cir. 2010) ("We have stressed the importance of Rule 23(e), noting that a district court acts as a fiduciary, guarding the claims and rights of the absent class members." (internal quotation marks omitted)).

## V.  DISCUSSION

### A.  Class Certification is Appropriate for Purposes of Settlement

"When deciding a motion for settlement, the Court must first determine whether the settlement class is appropriate for certification and then turn to whether the settlement itself should be approved."  *Alin v. Honda Motor Co.*, No. 08-4825, 2012 WL 8751045, at *2 (D.N.J. Apr. 13, 2012).

Federal Rule of Civil Procedure 23 "is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsel's ability to

fairly and adequately protect class interests." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc) (quoting *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010)). "[A]ctions certified as settlement classes must meet the same requirements under Rule 23 as litigation classes." *GM Truck Prods.*, 55 F.3d at 799.  Accordingly, the Court "first must determine that the requirements for class certification under Rule 23(a) and (b) are met." *In re Pet Food*, 629 F.3d at 341.  As discussed below, the Court finds that Settlement Classes meet the Rule 23(a) and 23(b)(3) requirements.

### 1. Rule 23(a): numerosity, commonality, typicality & adequacy of representation

Federal Rule of Civil Procedure 23(a) provides that

> [o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

These four requirements are referred to as: "(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *In re Prudential*, 148 F.3d at 308-09.

### i. Numerosity

Federal Rule of Civil Procedure 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable."  "There is no minimum number of members needed for a suit to proceed as a class action," and "Rule 23(a)(1) requires examination of the specific facts of each case." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012).

Here, the Settlement Administrator has identified a combined 3,497 properties in Classes A and C.  (D.E. No. 415-4 ¶ 17).  The class ownership period for Classes A and C is "May 17, 2010 up to and including October 1, 2014."  (D.E. No. 415-3 at 6).  So, Classes A and C

comprise multiple owners of a single property, such as the Class C property of Hugh Brown and Richard Westby-Gibson.

The Court finds that joinder of so many individuals would be impracticable and the numerosity requirement is satisfied. *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) ("No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.").

### ii.   Commonality

Federal Rule of Civil Procedure 23(a)(2) requires that "there are questions of law or fact common to the class."  "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury" and that their claims "depend upon a common contention" that "is capable of classwide resolution."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  The contention is capable of "classwide resolution" if the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*; *see also In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. 351, 371 (E.D. Pa. 2015) ("The [commonality] standard is not stringent; only one common question is required."), *aff'd*, 2016 WL 1552205 (3d Cir. Apr. 18, 2016).

Commonality exists here.  The allegations of Settlement Classes A and C concern COPR contamination—and the related hexavalent chromium contamination—coming from the Mutual plant and Mutual Sites.  Plaintiffs seek to hold Honeywell liable for engaging in abnormally dangerous activity, negligence, and the consequent nuisance in connection with this purported contamination.   And the historical operations of Honeywell's predecessor (Mutual), the contamination of the Mutual plant and Mutual Sites, as well as the remedial investigation and

remedial efforts of Honeywell, will be common to each class member.  The Class A and C members have therefore suffered the same injury, and their claims depend upon a common contention regarding Honeywell's conduct that is capable of classwide resolution.  *See Wal-Mart Stores*, 131 S. Ct. at 2551.

### iii.    Typicality

Federal Rule of Civil Procedure 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004).  "The typicality criterion is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees."  *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994).  "However, typicality, as with commonality, does not require that all putative class members share identical claims."  *Warfarin Sodium Antitrust Litig.*, 391 F.3d at 531-32.  "Indeed, even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories."  *Baby Neal*, 43 F.3d at 57.

Here, the typicality requirement is met.  For Class A, the Settlement Class Representative is plaintiff Shem Onditi.  For Class C, the Settlement Class Representative is plaintiff Sergio de la Cruz.  Both Representatives contend that their respective properties have been adversely affected by the alleged COPR and hexavalent chromium contamination from Honeywell's conduct.  (*E.g.*, 6th Am. Compl. ¶¶ 12, 15).  And this contention is typical of the Classes each

Representative intends to represent.  For settlement purposes, the typicality requirement is therefore satisfied.  *See Baby Neal*, 43 F.3d at 57 ("[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims.").

### iv.    Adequacy of Representation

Federal Rule of Civil Procedure 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  This requirement "has two components designed to ensure that absentees' interests are fully pursued."  *Warfarin Sodium Antitrust Litig.*, 391 F.3d at 532.

"First, the adequacy inquiry tests the qualifications of the counsel to represent the class." *Id.*; *see also GM Truck Prods.*, 55 F.3d at 801 ("Courts examining settlement classes have emphasized the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant.").  Here, the Court's independent review of the background of Plaintiffs' retained counsel shows that counsel is qualified, having experience with complex environmental litigation, toxic tort litigation, and class action litigation.[6]

Second, the adequacy inquiry "seeks to uncover conflicts of interest between named parties and the class they seek to represent."  *Warfarin Sodium Antitrust Litig.*, 391 F.3d at 532. As discussed above, each representative Plaintiff shares Class A and Class C's respective interests because the representatives allege that their properties have been negatively impacted

---

[6] As another court in this District rightly noted, "[a]s a result of the 2003 amendments to the Federal Rules of Civil Procedure, the issue of appropriate class counsel is guided by Rule 23(g), rather than 23(a)(4)."  *In re Royal Dutch/Shell Transport Sec. Litig.*, No. 04-374, 2008 WL 9447623, at *14 n.3 (D.N.J. Dec. 9, 2008) (citation omitted).  As in that case, however, "[f]or the sake of convenience . . . the adequacy of counsel is discussed here." *Id.*

from COPR and hexavalent chromium contamination coming from the Mutual plant and Mutual Sites—and they seek the same damages as their respective classes.  Further, both Onditi and de la Cruz are subject to the same allocation of settlement funds as the other Class A and Class C members.

### 2.  Rule 23(b)(3): Predominance & Superiority

Regarding Federal Rule of Civil Procedure 23(b), the parties contend that, for purposes of settlement here, Rule 23(b)(3) is satisfied.  (Parties' Joint Motion at 34).  Rule 23(b)(3) provides, in relevant part, that "a class action may be maintained if Rule 23(a) is satisfied and if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Rule 23(b)(3) further provides that

> [t]he matters pertinent to these findings include:
>
> (A)  the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)  the likely difficulties in managing a class action.

"The twin requirements of Rule 23(b)(3) are known as predominance and superiority." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008).

So, under Rule 23(b)(3), "two additional requirements must be met" to certify Classes A and C in this case: "(1) common questions must predominate over any questions affecting only individual members (the predominance requirement), and (2) class resolution must be superior to

other available methods for the fair and efficient adjudication of the controversy (the superiority requirement)."  *See Warfarin Sodium Antitrust Litig.*, 391 F.3d at 527 (internal quotation marks omitted).

### i.      Predominance

"Parallel with Rule 23(a)(2)'s commonality element, which provides that a proposed class must share a common question of law or fact, Rule 23(b)(3)'s predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members."  *Sullivan*, 667 F.3d at 297.  The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Under Third Circuit precedent, "the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct."  *Sullivan*, 667 F.3d at 298.

Here, the Plaintiffs seek to hold Honeywell liable for the alleged generation, disposal, and failure to remediate COPR and hexavalent chromium contamination coming from the Mutual plant and Mutual Sites.  Plaintiffs' claims stem from Honeywell's alleged conduct involving disposal, transportation, and remediation (or lack thereof) of COPR and associated hexavalent chromium contamination.  The Court finds that the common issues here adequately predominate over any individual issues for settlement purposes under Rule 23(b)(3).

### ii.     Superiority

"The superiority requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of

adjudication.'"  *Warfarin Sodium Antitrust Litig.*, 391 F.3d at 533-34 (quoting *In re Prudential*, 148 F.3d at 316).

The Court finds that the class action route is the superior method here.  Nothing from the record—including the objectors' contentions—suggests that individuals are more likely to file individual actions or be able to settle and recover on individual actions.  In so observing, the Court is mindful of the costs of litigation.  Given the allegations in this case, the Court finds that the "magnitude of the dispute renders the class action a superior method for fairly and efficiently resolving the claims as compared to numerous individual suits in which litigation costs would dwarf any potential recovery."  *See McDonough v. Horizon Healthcare Servs., Inc.*, No. 09-571, 2014 WL 3396097, at *10 (D.N.J. July 9, 2014), *aff'd*, No. 14-3558, 2015 WL 5573821 (3d Cir. Sept. 23, 2015); *see also Weissman v. Gutworth*, No. 14-666, 2015 WL 3384592, at *4 (D.N.J. May 26, 2015) ("The class action mechanism is the superior method for bringing the present class members' claims. It offers prompt relief and averts the undue costs class members would incur in prosecuting their claims individually. There is no indication that any individual class member has filed a complaint against Defendants elsewhere.").

### B.   An Initial Presumption of Fairness Exists

The Court must "apply an initial presumption of fairness when reviewing a proposed settlement where: (1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  *Warfarin Sodium Antitrust Litig.*, 391 F.3d at 535 (internal quotation marks and citation omitted).

These four elements are satisfied here.  As further discussed below, the settlement negotiations occurred at arm's length because they occurred after almost three years of fact

discovery and involved two rounds of multi-day negotiations before an experienced and skilled third party mediator.  (D.E. No. 415-1 at 5; D.E. No. 434).  No objector disputes any of this. Moreover, the objections concerned three properties from over 3,000 identified properties.  And only Ms. Chandra opposed the parties' joint motion for final approval of class action settlement and appeared at the Fairness Hearing.  The Court finds that, under these circumstances, an initial presumption of fairness exists.

### C.  Analysis of the *Girsh* factors

Federal Rule of Civil Procedure 23(e)(2) provides that, "[i]f the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate."  "In this process, 'trial judges bear the important responsibility of protecting absent class members,' and must be 'assur[ed] that the settlement represents adequate compensation for the release of the class claims.'"  *Sullivan*, 667 F.3d at 319 (quoting *In re Pet Food*, 629 F.3d at 349) (alterations in original).  And, "where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously, . . . district courts . . . [should] be even 'more scrupulous than usual' when examining the fairness of the proposed settlement."  *Warfarin Sodium Antitrust Litig.*, 391 F.3d at 534 (quoting *GM Truck Prods.*, 55 F.3d at 805).

In so doing, the Court must consider the *Girsh* factors:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks
> of establishing liability; (5) the risks of establishing damages; (6)
> the risks of maintaining the class action through the trial; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery; and (9) the range of reasonableness of the
> settlement fund to a possible recovery in light of all the attendant
> risks of litigation.

- 18 -

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotation marks and ellipses omitted); *see also GM Truck Prods.*, 55 F.3d at 785; *McDonough*, 2014 WL 3396097, at *4 ("The key question the Court must address in considering an application for approval of a class action settlement is whether the proposed settlement is 'fair, reasonable and adequate.' The Third Circuit has set forth a number of factors relevant in making this determination [which are known as] the '*Girsh* factors . . . .'" (citation omitted)).

As discussed below, the Court finds that the *Girsh* factors—on balance—weigh in favor of approving the proposed settlement.

(1) The first *Girsh* factor: the complexity, expense and likely duration of the litigation

"This factor captures 'the probable costs, in both time and money, of continued litigation.'" *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001) (quoting *GM Truck Prods.*, 55 F.3d at 812). Here, it is unquestionable that continued litigation between Classes A and C and Honeywell would require the parties—and the Court—to expend significant resources. Plaintiffs filed this suit in 2010. Honeywell filed a motion to dismiss relating to statute of limitations and a motion for reconsideration of the Court's decision denying the motion to dismiss. As the parties correctly note, fact discovery has been ongoing for approximately three years—but the case is still in the pre-class certification, fact-discovery stage. Aside from going through expert discovery, the issue of class certification would need to be resolved (including any appeal of that issue). The Court expects further motion practice involving, but not limited to, discovery disputes, potential case-dispositive issues, class certification, and pre- and post-trial submissions.

The Court also expects that—given the allegations in this case—"trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of

both the parties and the court," which "clearly counsels in favor of settlement." *See In re Prudential*, 148 F.3d at 318; *see also GM Truck Prods.*, 55 F.3d at 812 ("[T]his settlement made its remedies immediately available and avoided the substantial delay and expense that would have accompanied the pursuit of this litigation."). After all, this case involves complex legal issues and technical disciplines such as environmental science, air modeling, and property valuation. Including both Classes A and C, this involves well over 3,000 residential properties. And, for example, the class-wide diminution-in-property analysis seemingly required for part of Plaintiffs' requested relief appears legally and factually complex. Accordingly, the Court finds that the first *Girsh* factor weighs in favor of approving the settlement.

(2) The second *Girsh* factor: the reaction of the class to the settlement

"In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors." *GM Truck Prods.*, 55 F.3d at 812. A "vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement, and the objectors' arguments otherwise are not convincing." *In re Cendant Corp. Litig.*, 264 F.3d at 235.

Here, from early June 2015 to early September 2015, the Claims Administrator sent approximately 5,500 claim packets—which included a notice of proposed class action settlement providing, among other things, the settlement terms and a claim-and-release form. (D.E. No. 415-4 ¶ 9; D.E. No. 435 ¶ 2). 2,232 valid claims were submitted for 2,089 of the 3,497 properties. (D.E. No. 435 ¶ 8 & ¶ 8 n.3). This reflects a response rate of nearly 60%. (*Id.* ¶ 8). As noted above, there have been only twenty-eight opt-out requests and three objections. Given

the relative minimal number of objectors and opt-outs, the Court finds that the second *Girsh* factor weighs in favor of approving the settlement.

To be sure, the Court doesn't find that the objectors' arguments compel a different finding.[7]   Namely, the Court agrees with the settling parties that the joint objection of Hugh Brown and Richard Westby-Gibson must be overruled because the Settlement resolves claims concerning alleged damage to property, not for personal injury, bodily injury or medical monitoring claims.   In fact, the Settlement explicitly provides that "[p]ersonal injury, bodily injury, and medical monitoring claims (if any) are *not* Released Claims."  (D.E. No. 415-3 at 7-8 (emphasis added)).   Accordingly, the Court overrules this objection because it rests on a misplaced premise (i.e., that this Settlement resolves claims concerning personal, bodily injury, or medical monitoring).

Ms. Holly Marenna-Hurly's objection likewise appears to rest, in part, on health risks. But, as with the previous objection, the Court agrees with the settling parties that the Settlement concerns property damage without the release of claims for personal injury, bodily injury, or medical monitoring.  Ms. Marenna-Hurly also contends that "it is difficult to accept a settlement of approximately $1,800" in exchange for her "property's worth and devaluation."  (D.E. No. 410).   As an initial matter, the settlement amount that Ms. Marenna-Hurly references has changed since she filed her objection; it is now approximately $2,900.   Moreover, as this Opinion sets forth, Plaintiffs face an uncertainty of success.   This holds true after years of discovery, consultation with experts, and multi-day negotiations before an experienced mediator. And the Court is mindful that 2,232 valid claims have been submitted for 2,089 of the 3,497 properties.  Given the risks, the immediate benefit that the Settlement provides must be afforded due credit.  Ms. Marenna-Hurly's objection is overruled.

---

[7] The Court also addresses arguments from the three objections elsewhere in this Opinion, as relevant.

(3) The third *Girsh* factor: the stage of the proceedings and the amount of
discovery completed

"This factor 'captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating.'" *In re Cendant Corp. Litig.*, 264 F.3d at 235 (quoting *GM Truck Prods.*, 55 F.3d at 813).

This case was filed in 2010.  Over the course of almost three years, extensive discovery was exchanged regarding class certification and related merits issues.  Honeywell produced over one million pages concerning, among other things, the history of contamination, status of remediation efforts, regulatory communications, and sampling and monitoring data.  Further, discovery included depositions of third parties such as authors of certain studies referenced in the Plaintiffs' complaint, regulators, and Honeywell's remediation contractor.  And the Class Representatives for Classes A and C each provided deposition testimony and responded to interrogatories and document requests.

The type and amount of discovery extends beyond this overview, and the Court is satisfied that Settlement Class Counsel and Honeywell have conducted sufficient discovery to inform settlement negotiations.  Indeed, the proposed settlement results from—not only the discovery—but also two rounds of multi-day negotiations before Eric D. Green, an experienced and skilled third-party mediator whose background the Court has independently reviewed.  (*See* Parties' Joint Motion at 5; D.E. No. 434; *see also* 9/24/15 Tr. at 10:8-17).  The Court finds that the third *Girsh* factor weighs in favor of approving the settlement.

(4) & (5)  The fourth and fifth *Girsh* factors: the risks of establishing liability & the
<u>risks of establishing damages</u>

"By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *GM Truck Prods.*, 55 F.3d at 814.  The fifth *Girsh* factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *Id.* at 816.  So, "[t]he fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential*, 148 F.3d at 319.

Here, Settlement Class Counsel and Honeywell have directly opposing views as to liability and damages.  Settlement Class Counsel contends that Honeywell has already been found strictly liable for the disposal of chromium waste in Jersey City.  (Parties' Joint Motion at 20 (citing *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 851 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005))).  Settlement Class Counsel highlights that, in September 2008, the U.S. Agency for Toxic Substances and Disease Registry (along with certain New Jersey state agencies) determined that residents living near the Class A and Class C communities had as high as a 17% increase in the incidence of lung cancer when compared with other populations inside and outside of Jersey City.  (Parties' Joint Motion at 20).  Settlement Class Counsel also cites a 2008 study by the University of Medicine and Dentistry of New Jersey/Robert Wood Johnson Medical School and Environmental & Occupational Health Sciences Institute, which purportedly found hexavalent chromium dust inside all homes sampled in Jersey City.  (*Id.* at 20-21).  Settlement Class Counsel further cites a New Jersey Department of Environmental Protection peer-reviewed risk assessment that purportedly shows that the

appropriate residential cleanup criteria is "orders of magnitude below the existing levels surrounding Plaintiffs' homes." (*Id.* at 21).

So, Settlement Class Counsel argues that a jury could find in favor of Plaintiffs given the case law, various studies (including the above-mentioned studies), documents and testimony assembled through discovery, and with expert testimony. (*Id.*). To be sure, Settlement Class Counsel asserts that Plaintiffs' claims are not time-barred. (*Id.* at 22). And, as for damages, Settlement Class Counsel contends that Plaintiffs would proffer expert testimony showing that the historic—and ongoing—chromium contamination has caused a class-wide diminution in property value. (*Id.*). This diminution in value is allegedly caused "by the presence of chromium contamination, independent of any other factors, including any nation-wide economic recession." (*Id.*).

In opposition, Honeywell contends that Plaintiffs "will face considerable difficulties in establishing both liability and damages, and that Plaintiffs will be unable to do so a class-wide basis." (*Id.* at 16). Indeed, Honeywell argues that—in view of certain sampling data—neither COPR nor chromium disposed on the Mutual Sites migrated into either the Class A or Class C areas (or otherwise contaminated Plaintiffs' properties). (*Id.*; *see also* 9/24/15 Tr. at 99:23-102:13 (identifying, from Honeywell's point of view, the alleged weaknesses in Plaintiffs' case for purposes of liability)).

In fact, Honeywell cites certain governmental studies purportedly showing that Class A and Class C members have not been injured. (*See* Parties' Joint Motion at 16-17). "Thus, Honeywell contends that any fear or concern regarding the presence of chromium from the Mutual Sites is not reasonable and is contradicted by other discovery obtained in the case; these and other issues, like causation and injury, present substantial obstacles for certifying a litigation

class." (*Id.*).  To be sure, Honeywell argues that "considerable evidence of public awareness of the chromium issue in Jersey City may preclude Plaintiffs' claims based on statute of limitations grounds." (*Id.* at 19).

Honeywell also challenges that the property values of Classes A and C have been negatively affected.  (*Id.* at 18).  It argues that, if this case were to proceed, "Honeywell would proffer expert testimony that there has been no discernable diminution in property value attributable to the Mutual Sites." (*Id.*).  In fact, Honeywell avers that there are past and ongoing substantial remediation and redevelopment efforts—which undercuts Plaintiffs' diminution-of-value argument.  (*Id.* at 18-19).

It is apparent that this is a complex case that involves plainly divergent views on liability and damages.  Even if this case were to traverse class certification and summary judgment challenges, Plaintiffs faces a real risk that a jury could find no liability.  (*See, e.g.*, *id.* at 22-23 ("Settlement Class Counsel is also cognizant of a possible defense by Honeywell as to the issue of causation, given Honeywell's assertion that any alleged presence of hexavalent chromium on class members' properties are consistent with background levels and are consistent with what is seen in other areas of New Jersey with no history of chromium production.")).

But, even setting aside the issue of liability, it seems that there would be a significant battle of experts on damages.  *See In re Cendant Corp. Litig.*, 264 F.3d at 239 ("[T]he damages determination proffered by Lead Plaintiff's expert is complex and hard to follow, freighted with involved calculations and conceptually difficult issues. Were a jury confronted with *competing* expert opinions of corresponding complexity, there is no compelling reason to think that it would accept Lead Plaintiff's determination rather than Cendant's, which would posit a much lower figure for the Class's damages." (emphasis in original)).

Given the apparent uncertainty of success, the Court finds that the fourth and fifth *Girsh* factors weigh in favor of approving the settlement.

(6) The sixth *Girsh* factor: the risks of maintaining the class action through the trial

"Under Rule 23, a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable." *In re Prudential*, 148 F.3d at 321. Notably, "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the action." *GM Truck Prods.*, 55 F.3d at 817. But "[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." *In re Prudential*, 148 F.3d at 321.

Here, "Settlement Counsel acknowledges that Honeywell intends to challenge class certification in a litigated context and recognizes that there is no guarantee that this Court will certify all, or any, of Plaintiffs' claims." (Parties' Joint Motion at 23). As alluded to above, "class certification is always conditional and may be reconsidered"—and there doesn't seem to be any particular "reason why the Court would decertify or modify the class." *See Weissman*, 2015 WL 3384592, at *6. The Court therefore finds that the sixth *Girsh* factor is neutral.

(7) The seventh *Girsh* factor: the ability of the defendants to withstand a greater judgment

This factor "is concerned with whether the defendant[] could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant Corp. Litig.*, 264 F.3d at 240. To this extent, Settlement Class Counsel and Honeywell submit the following:

> Plaintiffs contend that if the case were to proceed to trial, Plaintiffs would continue to pursue substantial damages against Honeywell. However, although Plaintiffs have alleged substantial damages, the risk that Plaintiffs would not be able to sustain their claims, either at class certification, or on the merits, or would be able to recover damages in a less substantial amount, supports approval of the settlement given that the Settlement Agreement provides

> substantial and immediate relief to the Settlement Class Members.
> *Because of this, the ability of Honeywell to withstand a greater*
> *judgment is of diminished importance here.*

(Parties' Joint Motion at 24-25 (emphasis added); *see also* 9/24/15 Tr. at 24:18-25:3).

The Court agrees.  Even if Honeywell could afford a greater amount than the Settlement would require, that doesn't support "rejecting an otherwise reasonable settlement."  *See Saini v. BMW of N. Am., LLC*, No. 12-6105, 2015 WL 2448846, at *11 (D.N.J. May 21, 2015) ("[T]he Court is satisfied that the settlement is fair, reasonable, and adequate, despite the possibility that Defendant could pay a greater sum.").

So the circumstances here diminish the importance of the seventh *Girsh* factor, and this factor is not relevant to the Court's evaluation herein.  *See Yong Soon Oh v. AT & T Corp.*, 225 F.R.D. 142, 150-51 (D.N.J. 2004) ("There is no question that being the large conglomerate that it is, the defendant could have withstood a significantly greater judgment. While this factor would, therefore, seem to weigh against the proposed settlement, the difficulties the plaintiffs would have had in certifying a damages class and proving damages diminish the importance of this factor here."); *see also McDonough*, 2014 WL 3396097, at *8 ("This factor is not relevant to the Court's evaluation.").

(8) & (9) The eighth and ninth *Girsh* factors: the range of reasonableness of the settlement fund in light of the best possible recovery & the range of reasonableness of the <u>settlement fund to a possible recovery in light of all the attendant risks of litigation</u>

"The last two *Girsh* factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial."  *In re Prudential*, 148 F.3d at 322; *see also Pro v. Hertz Equip. Rental Corp.*, No. 06-3830, 2013 WL 3167736, at *5 (D.N.J. June 20, 2013) ("The final two *Girsh* factors are typically considered in tandem.").  In other words, the "last two *Girsh* factors evaluate whether the settlement represents a good value

for a weak case or a poor value for a strong case." *Warfarin Sodium Antitrust Litig.*, 391 F.3d at 538. "In order to assess the reasonableness of a proposed settlement seeking monetary relief, 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.'" *In re Prudential*, 148 F.3d at 322 (quoting *GM Truck Prods.*, 55 F.3d at 806). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved*." In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (internal quotation marks and citation omitted).

Ms. Maureen Chandra argues that the eighth *Girsh* factor "requires the court to evaluate the settlement in light of the best possible recovery"—but that "[Settlement] Class Counsel refused to provide the Court with an estimate of the best possible recovery, even though Class Counsel 'retained and consulted with experts' concerning loss of property value and presumably seeks reimbursement of those expert expenses from the settlement." (D.E. No 417 at 4 (quoting Parties' Joint Motion at 24)). She also contends that the Court has insufficient information to decide whether the proposed settlement is fair, reasonable, and adequate because there is no information concerning soil or ground water contamination in the class members' properties. (*Id.* at 2-3).

Settlement Class Counsel "has not speculated as to what the best recovery Plaintiffs could have obtained had they decided to pursue their claims, but contends that the proposed Settlement Agreement is fair, reasonable, and adequate given that the value of immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation." (Parties' Joint Motion at 24). For its part, Honeywell states it "would proffer expert testimony

- 28 -

that there has been no discernable diminution in property value attributable to the Mutual Sites and that additional evidence demonstrates that Plaintiffs and Class Members have not been damaged at all." (*Id.*). Further, both contend that "continuing to litigate this case through class certification, summary judgment, and trial will be a lengthy, complicated, and expensive process"—in addition to the likelihood of an appeal, the related costs, and the attendant delay of final resolution. (*Id.*). The Court is persuaded by the settling parties' contentions.

Moreover, the Court finds convincing Honeywell's argument that requires testing of the Class Members' properties before the Settlement Agreement is approved "would essentially require the Court to try the case in the context of a settlement hearing, thus defeating the very purpose of settlement, which is to avoid the delay and expense of continued litigation." (D.E. No. 419 at 2). It is of course true that "[w]hen the parties have not supplied the information needed for the court to determine whether the settlement is fair, reasonable, and adequate, the court may affirmatively seek out such information." *In re Pet Food*, 629 F.3d at 351. But this is not a situation where *no* information exists; this appears to be a situation where Settlement Class Counsel and Honeywell disagree as to the significance and impact of the information that does currently exist. (*Compare* Parties' Joint Motion at 16-18 *with* Parties' Joint Motion at 20-21 (providing opposing positions based on research and studies)).

Accordingly, the Court agrees with Settlement Class Counsel that there is no fatal flaw by not having an estimate of the best possible recovery. Determining the best possible recovery in this case appears to risk either being exceedingly speculative—or exceedingly burdensome by compelling litigation to continue, including further fact discovery and full-blown expert discovery, all of which this Settlement seeks to avoid. The key is that this Settlement, like others approved in this District, "yields substantial and immediate benefits, and it is reasonable in light

of the best possible recovery and the attendant risks of litigation—little or no recovery at all." *See, e.g.*, *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 240 (D.N.J. 2005); *In re Processed Egg Prods. Antitrust Litig.*, 302 F.R.D. 339, 360 (E.D. Pa. 2014) ("Certainly, calculating the best possible recovery against Cal–Maine for the class in the aggregate is 'exceedingly speculative' at this point in time given the previously-discussed risks of establishing liability and damages associated with this complex litigation, even when considering that treble damages are technically available for recovery under Plaintiffs' Sherman Act claim.").[8]

The Court has also carefully considered Ms. Chandra's objection that the Settlement release "includes 'UNKNOWN' and 'UNFORESEEN' claims that class members 'may have in the future.'" (D.E. No. 417 at 5 (quoting D.E. No. 415-3 at 8)). She argues that "[i]t is impossible for anyone to evaluate an unknown and unforeseen future event" and "[n]either Honeywell nor [Settlement] Class Counsel have provided the court with any method to evaluate unknown and unforeseen future claims." (*Id.*). Ms. Chandra avers that, because "the court is unable to evaluate unknown and unforeseen future claims, the release of such claims is fatal to the Settlement Agreement." (*Id.*; *see also* 9/24/15 Tr. at 68:12-14 ("The release says you are releasing contamination and remediation claims.")).

---

[8] Further, the Court is mindful that Settlement Class Counsel may have concerns that, even if "plaintiffs' merits-phase damages expert had finalized his damages model at this stage of the litigation (which he has not), it would be prejudicial to force plaintiffs to disclose that figure while the case against PPG is proceeding." (D.E. No. 425 at 6 n.6). To be sure, Ms. Chandra argued that this poses a conflict of interest because "what class counsel is saying that class B would be prejudiced by class counsel producing an expert report showing the many levels of damages for the current plaintiffs" in connection with the eighth *Girsh* factor. (9/24/15 Tr. at 90:16-19, 121:2-11). The Court agrees with Settlement Class Counsel that Ms. Chandra's argument rests on the assumption that an estimate of the best possible recovery is *required*. This case has been bifurcated into a Class Phase and a Merits Phase, and this case is still in the Class Phase—meaning that the Merits Phase damages expert has not completed a damages model. (D.E. No. 432 at 11). The Court finds that precedent does not compel rejecting a settlement and forcing Plaintiffs' expert to provide a damages model at this juncture, thereby risking excessive speculation, additional costs and/or delay.

The Court disagrees.  The Settlement provides, in relevant part, that "Released Claims" include claims

> arising out of the ownership of 1-4 family residential property in Settlement Class A area or Settlement Class C area, including without limitation punitive damages, in either law or equity, under any theory of common law or under any federal, state, or local law, statute, regulation, ordinance, or executive order that the Class Member ever had or may have in the future, whether directly or indirectly, that arose from the beginning of time through execution of this Agreement, WHETHER FORESEEN OR UNFORESEEN, OR WHETHER KNOWN OR UNKNOWN TO ALL OR ANY OF THE PARTIES, that arise out of the release, migration or impacts or effects of COPR, hexavalent chromium, or other chemical contamination (a) originating from the Mutual Facility at any time through the date of this Agreement or (b) present on or released or migrating at or from Study Area 5, Study Area 6 South, Study Area 6 North, Study Area 7, or Site 119 at any time through the date of this Agreement, including but not limited to property damage, remediation costs, diminution of value to property, including stigma damages, loss of use and enjoyment of property, fear, anxiety, or emotional distress as a result of the alleged contamination.

(D.E. No. 415-3 at 7-8).

As Honeywell notes, an individual is *not* forgoing the possibility of all relief.  Rather, as went undisputed by Ms. Chandra at the Fairness Hearing, such an individual could turn to the New Jersey Department of Environmental Protection—and Honeywell would have to remediate pursuant to the New Jersey Spill Act, N.J.S.A. 58:10-23.11.  (9/24/15 Tr. at 103:16-104:14).  In other words, the Release does *not* require giving up an ability to obtain remediation all together; it releases "an ability to seek damages from [Honeywell] . . . above and beyond the remediation that the state would require."  (*Id.* at 104:10-14).  And the Court finds significant that Honeywell has been conducting remediation at each of the COPR disposal sites that Plaintiffs have alleged

were associated with Mutual's operations "pursuant to several different federal and state orders, and under the supervision of both the New Jersey Department of Environmental Protection and a Special Master appointed by the United States District Court of the District of New Jersey." (Parties' Joint Motion at 18-19; *see also* 9/24/15 Tr. at 94:9-99:20 (detailing the history, knowledge, and status of contamination and remediation efforts using demonstratives)).

In so finding, the Court is not substituting "the parties' assurances or conclusory statements for its independent analysis of the settlement terms."  (*See* D.E. No. 417 at 3 (quoting *In re Pet Food*, 629 F.3d at 350)).  The Court has carefully considered several issues, including the definition and scope of the Released Claims and that well over 2,000 valid claims have been submitted for 2,089 of the 3,497 identified properties.  Indeed, the Court is particularly cognizant of the "overriding public interest in settling class action litigation," *Warfarin Sodium Antitrust Litig.*, 391 F.3d at 535, and this Settlement provides an immediate benefit to those many individuals who have filed claims.  *See Sullivan*, 667 F.3d at 324 ("[S]ettlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."); *see also Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07-2898, 2012 WL 651727, at *11 (N.D. Ill. Feb. 28, 2012) ("The court will not dismantle this settlement for the sake of one class member's unique demands, particularly when the class member . . . had the right (and the means) to opt out and pursue its individual claims without disturbing the settlement for the rest of the class.").

Accordingly, the Court finds that the last two *Girsh* factors weigh in favor of approval over the objection of Ms. Chandra.

Summary of the Court's Analysis of the *Girsh* factors

"The district court must make findings as to each of the nine *Girsh* factors in order to approve a settlement as fair, reasonable, and adequate, as required by Rule 23(e)."  *In re Pet*

*Food*, 629 F.3d at 350.  The Court concludes that the *Girsh* factors weigh in favor of approval of the Settlement here.  This Settlement Agreement provides immediate benefits to nearly 60% of the identified properties.  It was reached after appropriate arm's-length negotiations before an experienced mediator.  The Court finds the Settlement Agreement thus reflects a settlement that is fair, reasonable, and adequate given the history, risks, and complexities associated with this case.

### D.  Notice is Adequate

Federal Rule of Civil Procedure 23 "contains two distinct notice provisions."  *In re Prudential*, 148 F.3d at 326.  "For classes certified under 23(b)(3), members must be provided with 'the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.'"  *Weissman*, 2015 WL 3384592, at *4 (quoting Fed. R. Civ. P. 23(c)(2)(B)).  Further, because simultaneous certification of Classes A and C are sought, as well as approval of the proposed Settlement, "notice must satisfy both the requirements of Rule 23(c)(2)(B) and Rule 23(e)(1)."  *In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. at 382-83.

Federal Rule of Civil Procedure 23(c)(2)(B) provides that, "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  This Rule further provides that the notice

> must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

And Federal Rule of Civil Procedure 23(e)(1) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." "The Rule 23(e) notice is designed to summarize the litigation and the settlement and to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *In re Prudential*, 148 F.3d at 327.  Notably, due process requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The Court finds that the notice requirement—in terms of both content and method of dissemination—is satisfied.  Regarding content, each Notice (i.e., to Class A members and Class C members) provides information concerning: class members' rights and obligations in connection with the proposed Settlement; procedures for opting out, submitting claims, and filing objections; the consequences of class members' choices; the nature of the claims covered under the proposed Settlement; and the possible relief available.  (*See* D.E. No. 415-4, Exs. A & B). Each Notice also discusses the litigation, the terms of the settlement, and—given the way the Classes are defined in this action—provides a map and street boundaries.  (*See id.*)

The Notice initially provided a deadline of July 31, 2015.  (*Id.*).  Settlement Class Counsel and Honeywell asked to extend this deadline to August 31, 2015 to: (1) give time for the appropriate state court to appoint a temporary administrator in light of the unexpected death of one of the class representatives (Sergio de la Cruz); and (2) "allow claimants additional time to file their Proofs of Claim" because "numerous claimants . . . have expressed a desire to submit Claims but require additional time."  (D.E. No. 401).  Finally, Claim and Release forms were

provided.  (D.E. No. 415-4, Exs. A & B).  Accordingly, the Court extended the deadline for

claims, opt-out requests, and objections from July 31, 2015 to August 31, 2015.  (D.E. No. 411).

Regarding distribution, starting on June 1, 2015, individual notices were sent by First

Class Mail to each property owner at his or her mailing address based on, *inter alia*, information

obtained from county property records.  (D.E. No. 415-4 ¶¶ 3-5).  If, however, county property

records show that the property owner did not live at the subject property, Notice was sent to both

the property owner's mailing address (based on the available records), as well as to the address

of the subject property itself.  (*Id.*).  This round of mailing constituted nearly 5,000 individual

notices to potential class members at both the eligible class property and mailing address.  (*Id.* ¶

5).

On July 14, 2015, the Claims Administrator sent a second round of notices via First Class

Mail—in postcard form—to any eligible class member that had not yet filed a claim form.  (*Id.* ¶

7).  This postcard informed recipients of the following: the July 31, 2015 deadline; a community

meeting that was going to be held on July 22, 2015[9]; the Claims Administrator's toll-free number

and website so that recipients could request copies of the original Notice or the Claim and

Release form, and certain other features of the settlement.  (*Id.*).

The website was dedicated to the Settlement.  (*Id.* ¶ 13).  On the website, the Claims

Administrator posted a copy of the Settlement Agreement, the individual mailed Notices, the

relevant deadlines, and certain other settlement-related materials.  (*Id.*).  The Claims

Administrator also established—and continues to maintain—a toll-free telephone number to

accommodate inquiries from potential class members and respond to questions.  (*Id.* ¶ 12; D.E.

No. 435 ¶ 3).  This hotline is accessible every day, 24 hours a day—and during regular business

---

[9] The stated purpose of the community meeting was to answer any questions regarding the proposed Settlement
Agreement.  (D.E. No. 415-4 ¶ 10).  The Claims Administrator was available at the meeting to distribute additional
copies of Notices and to help recipients complete Claims and Release Forms.  (*Id.*)

hours, callers can speak with a representative.  (D.E. No. 415-4 ¶ 12).  The settlement website displayed the above-mentioned extension (i.e., from July 31, 2015 to August 31, 2015).  (D.E. No. 415-4 ¶ 13).

On July 17, 2015, the Claims Administrator sent a third round of notices to owners of an additional 160 Settlement Class Properties that were first identified during the course of the notification process.  (*Id.* ¶ 8).  In total, the Claims Administrator sent—via mail or e-mail— 5,497 individual notices to subject property address and mailing addresses based on certain publicly available information.  (*Id.* ¶ 9).

Further, the Notices were published in a newspaper of general circulation in Jersey City called the *Jersey Journal*.  (D.E. No. 415-4 ¶ 11).  This ran once a week for four consecutive weeks starting on June 1, 2015, with instructions on how to view the Notice in Spanish.  (*Id.*).  Notably, this publication—not only provided similar information as the more detailed mailed Notices—but also directed individuals to the settlement website for further information and to retrieve copies of the Claim and Release Form.  (*Id.* ¶¶ 11, 13; D.E. No. 415-4, Ex. D).

Finally, on November 14, 2014, Honeywell served notice, as required by the Class Action Fairness Act, 28 U.S.C. § 1715, on the U.S. Attorney General and on the attorneys general for each of the fifty states—and no official took any action to oppose the proposed Settlement.  (Parties' Joint Motion at 28; 9/24/15 Tr. at 35:20-36:10).

Given this substantial effort, and having no received no objection to the substance or to the method of notice, the Court finds that the Notice here meets the requirements that Due Process and Federal Rule of Civil Procedure 23 mandates.

### E.  Plan of Allocation

"The Court must determine whether the Plan of Allocation contemplated in the Settlement Agreement is 'fair, reasonable, and adequate.'"  *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 147 (D.N.J. 2013) (quoting Fed. R. Civ. P. 23(e)(2)).  The Court finds that the proposed plan of allocation is fair, reasonable, and adequate because it treats all Settlement Class Property equally by allocating the same *pro rata* amount of the funds to that property.  And, where there are multiple property owners, the plan provides that each owner is entitled to a time-weighted *pro rata* distribution.

## VI.  ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS

Settlement Class Counsel seeks an award of reasonable costs, attorneys' fees, and incentive awards.  (D.E. No. 397).  Specifically, Settlement Class Counsel requests the following: (1) $2,504,250 in attorney fees, (D.E. No. 432 at 4); (2) $1,140,023.77 in costs, (D.E. No. 431); (3) $219,278.87 in claims administration expenses for the Claims Administrator, (D.E. Nos. 432 at 6 n.5 & 435 at Ex. A); and (4) $10,000 in incentive awards for each representative from Class A and Class C, (D.E. No. 415-3 at 20).

Federal Rule of Civil Procedure 23(h) provides that, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  It further provides, in relevant part, that the following procedures apply:

> (1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

> (2) A class member, or a party from whom payment is sought, may object to the motion.

> (3) The court may hold a hearing and must find the facts and state

its legal conclusions under Rule 52(a).

## A. Attorneys' Fees

The District Court abuses its discretion in awarding attorneys' fees if it fails to: apply the proper legal standard; follow proper procedures in making its determination; or bases an award upon findings of fact that are clearly erroneous.  *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 727 (3d Cir. 2001); *see also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301-02 (3d Cir. 2005) ("Notwithstanding our deferential standard of review of fee determinations, we have required district courts to clearly set forth their reasoning for fee awards so that we will have a sufficient basis to review for abuse of discretion. . . . [W]e remind the trial courts to engage in robust assessments of the fee award reasonableness factors when evaluating a fee request.").  So, "[i]n a class action settlement, the court must thoroughly analyze an application for attorneys' fees, even where the parties have consented to the fee award."  *Varacallo*, 226 F.R.D. at 248 (citing *GM Truck Prods.*, 55 F.3d at 820).

"Attorneys' fees requests are generally assessed under one of two methods: the percentage-of-recovery ('POR') approach or the lodestar scheme."  *Sullivan*, 667 F.3d at 330. The Third Circuit permits using the POR method for a "common fund" case such as this one. *See id.*; *see also In re Cendant Corp. PRIDES Litig.*, 243 F.3d at 734 ("The percentage-of-recovery method has long been used in this Circuit in common-fund cases.").

"In determining what constitutes a reasonable percentage fee award, a district court must consider the ten factors" in *Gunter v. Ridgewood Energy Corp*, 223 F.3d 190 (3d Cir. 2000) and *In re Prudential*, 148 F.3d 283.  *In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009).  These factors are:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of

- 38 -

the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, . . . (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement . . . .

*Id.* (citations omitted).

"The *Gunter/Prudential* factors are not exhaustive. 'In reviewing an attorneys' fee award in a class action settlement, a district court should consider [those] factors . . . , and any other factors that are useful and relevant with respect to the particular facts of the case.'" *Id.* at 541 n.34 (quoting *In re A T & T Corp.*, 455 F.3d 160, 166 (3d Cir. 2006)). So, "[t]he factors listed above need not be applied in a formulaic way. Each case is different, and in certain cases, one factor may outweigh the rest." *Gunter*, 223 F.3d at 195 n.1.

To be sure, "[i]n evaluating a fee award, [the Court] should begin by determining with reasonable accuracy the distribution of funds that will result from the claims process." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 179 (3d Cir. 2013). Here, 2,232 valid claims have been submitted for 2,089 of 3,497 properties to benefit from the Net Settlement Fund—and there is a Net Settlement Fund of $6,133,447.36. As discussed above, the Claims Administrator will prepare and mail checks to all Class Members for their *pro rata* share of the Net Settlement Fund. (*See generally* D.E. Nos. 415-3 & 435 (detailing, among other things, Claims Administrator's notice procedures, claims received, ongoing efforts, and procedures to be effectuated upon the Court's approval of the Settlement)).

As discussed below, the Court finds that the *Gunter* factors weigh in favor of approving the Settlement Class Counsel's fee award.  Where relevant, the Court incorporates by references certain reasons provided above for approval of the Settlement Agreement under the *Girsh* factors.  *See Saini*, 2015 WL 2448846, at *17 ("The Court finds that the totality of the *Gunter* factors weighs strongly in favor of approval of the fee award. Given the similarity and overlap of the *Gunter* and *Girsh* factors, the Court incorporates by reference the reasons given for approval of the Settlement Agreement.").

(1) The size of the fund created and the number of beneficiaries

The settlement obtained in this complex environmental action is $10,017,000.  The Net Settlement Fund is $6,133,447.36.  As noted, 2,232 valid claims have been submitted for 2,089 of 3,497 properties to benefit from this fund—which is a non-reversionary fund.  The Court finds that this factor weighs in favor of approval.

(2) The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel

The Court has discussed the three objections to the Settlement above.  But, in addition, Ms. Chandra opposes Settlement Class Counsel's application for fees and expenses.  (D.E. No. 407).  Briefly, she raises the following six objections: (1) attorney fees should be calculated on POR *after* all expenses are deducted, including administrative fees; (2) attorney fees and expenses pursing a medical monitoring class should be excluded; (3) attorney fees and expenses litigating against PPG should be excluded; (4) expenses for contract attorneys should be excluded; (5) Settlement Class Counsel's application for fees and expenses is defective because (a) the Court cannot determine the reasonableness of the rates charged by each attorney and (b) there is no itemization of expenses in a way that is reviewable by the Court and the classes; and (6) any changes to Settlement Class Counsel's fee request requires new notice.  (D.E. No. 407;

- 40 -

9/24/15 Tr. at 11-23).  Ms. Chandra is the sole objector to Settlement Class Counsel's application for fees, costs, and incentive awards.

"The absence of large numbers of objections mitigates against reducing fee awards."  *In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327, 337 (D.N.J. 2002).  This would seem to counsel the Court to find in favor of approval here.  *See id.* ("Only one shareholder . . . has filed an official objection to the amount of attorneys' fees included in the Settlement Agreement. Five other shareholders wrote to either the Court or to counsel to object to the amount of attorneys' fees. These six complaints arise out of the 200,000 notices that have been sent out to Cendant shareholders, notifying them of the settlement terms and the proposed attorneys' fees. . . . [I]t is appropriate to note the extremely small number of complaints that have arisen regarding the proposed attorneys' fees in the Settlement Agreement. This factor weighs in favor of approval of the requested attorneys' fees.").

Nevertheless, the Court addresses each of Ms. Chandra's objections at this juncture.  In so doing, this Court is cognizant of its duty to act "as a fiduciary" for each Class affected by the Settlement.  *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 308.

*First*, Ms. Chandra argues that attorney fees should be calculated on POR *after* all expenses are deducted, including administrative fees.  (D.E. No. 407 at 1-3).  She cites New Jersey Court Rule 1:21-7, asserting that this Rule "mandates that contingency fees be calculated on the balance of the recovery *after* deducing litigation expenses."  (*Id.* at 1, 3 (emphasis in original)).  On the surface, Ms. Chandra raises an interesting point given the text of this Rule, namely section 1:21-7(d).[10]

---

[10] New Jersey Court Rule 1:21-7(d) provides, in relevant part, that the "permissible fee provided for in paragraph (c) [of Rule 1.21-7] shall be computed on the net sum recovered after deducting disbursements in connection with the institution and prosecution of the claim."

But neither objector nor Settlement Class Counsel can cite a single federal decision applying New Jersey Court Rule 1:21-7 to examine attorney fees for reasonableness in a class-action like the instant action.  The Court's independent research confirms this.  Given that courts in this District—and, moreover, courts in the Third Circuit—are no stranger to class action litigation, the Court finds this telling.  And courts in this Circuit seem to consistently award fees based on the gross recovery.  (*See* D.E. No. 432 at 2-3 (collecting cases)).  Indeed, a court in this Circuit noted that "the Third Circuit continues to support calculation of attorneys' fees from the gross settlement fund."  *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 654 n.27 (E.D. Pa. 2015) (citing *In re Baby Prods. Antitrust Litig.*, 708 F.3d at 177-79).

Moreover, even if Settlement Class Counsel's fee is calculated on the balance of the recovery after deducting litigation expenses and administrative costs, the requested fee would be under 30% of the net recovery—which the Court finds reasonable in this action.[11]  *See In re A T & T Corp.*, 455 F.3d at 168 (acknowledging the trial court's "independent obligation to ensure the reasonableness of any fee request") (citation and quotation marks omitted); *see also* N.J. Ct. R. 1:21-7(f) ("If at the conclusion of a matter an attorney considers the fee permitted by paragraph [1:21-7(c)] to be inadequate, an application on written notice to the client may be made to the Assignment Judge or the designee of the Assignment Judge for the hearing and *determining of a reasonable fee in light of all the circumstances*. This rule shall not preclude the exercise of a client's existing right to a court review of the reasonableness of an attorney's fee.") (emphasis added).

*Second*, regarding new notice for modifications to the fee request, the Court agrees with Settlement Class Counsel and Honeywell.  As an initial matter, this objection appears moot to

---

[11] $2,504,240 of $10,017,000 represents approximately 25%; whereas $2,504,240 of ($10,017,000 – ($1,140,023.77 + $219,278.87)) represents approximately 28%.  (*See* D.E. No. 413 at 4).

some extent because Settlement Class Counsel provided website notice of the change in the fee and expenses requests at http://honeywelljerseycitysettlement.com/. The website explicitly notes a decrease in request for reimbursement of costs—from $1,191,174.67 to $1,140,023.77—and providing a link to the related post-Fairness Hearing submission to the Court, (D.E. No. 431). (*See also* Ms. Chandra's Objection, 9/24/15 Tr. at 62:20-23 ("And when I say new notice to the class, I am not suggesting that it should be a new postcard notice. It could perfectly be notice on the website, the settlement website.")).

To be sure, Ms. Chandra contends that if Settlement Class Counsel is changing its fee request from approximately 25% to approximately 28%, this requires additional notice.  (9/24/15 Tr. at 62:11-19; *see also* D.E. No. 413 at 4 ("Even assuming, *arguendo*, that Class Counsel's fee should have been calculated on the balance of the recovery after deducting litigation expenses and administrative costs, the requested fee of $2,504,240 would still constitute a mere 28.7% of the net recovery and would therefore remain directly in line with awards in similar cases.")). But, as Settlement Class Counsel correctly notes, the amount of $2,504,240 *stays exactly the same* as the amount initially provided to Class Members.  (*See* D.E. No. 415-4 at 18, 29).  In other words, the dollar amount of the fee request stays the same—even if the percentage of recovery changes from approximately 25% to approximately 28%.

The Court finds that Federal Rule of Civil Procedure 23(h) does not necessitate further notice in this regard.  This Rule provides, in relevant part, that: "Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner."  Fed. R. Civ. P. 23(h)(1).  "Unlike Rule 23(c) (2), which requires 'best notice practicable under the circumstances,' the far more relaxed standard of Rule 23(h) (1)—notice in a 'reasonable manner'—applies here."  *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-374,

2008 WL 9447623, at *34 (D.N.J. Dec. 9, 2008).  "The plain meaning of quoted language of Rule 23(h) does not require the moving attorney disseminate the entire text of the memoranda and declarations supporting the motion for fees, only that notice of the motion be given."  *Id.* at *35 n.12.  Further, "[t]o date, . . . the Court of Appeals for the Third Circuit has not interpreted Rule 23(h) to include a requirement that applications for attorneys' fees in class action settlements must precede the objection deadline."  *In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199, 222 (E.D. Pa. 2014).  As Honeywell aptly notes, (*see* D.E. No. 433 at 2-3), it stands to reason that—if Rule 23(h) doesn't require that Class Members be given all the details of an fee motion—then the modifications contemplated in this case would not warrant a new round of notice dissemination.

*Third*, the Court overrules Ms. Chandra's objection that Settlement Class Counsel's application for fees and expenses is defective because (a) the Court cannot determine the reasonableness of the rates charged by each attorney and (b) there is no itemization of expenses in a way that is reviewable by the Court and the classes.  As an initial matter, Ms. Chandra contends that "[a]ny late submission by Class Counsel correcting deficiencies in their motion for fees and expenses, without granting the class an opportunity to review and object to those submissions, violates Fed. R. Civ. P. 23(h)." (D.E. No. 407 at 9).  But, as discussed immediately above, the Court disagrees that Federal Rule of Civil Procedure 23(h) imposes such a requirement.  Indeed, as Settlement Class Counsel correctly notes—not only would this result in increased administrative and other expenses—but, "[a]t the fee determination stage, the district judge must protect the class's interest by acting as a fiduciary for the class."  *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 308.

Moreover, the Court has received and carefully reviewed documentation of time records and expenses for *in camera* review.  (*See* D.E. Nos. 430 & 431).  Upon review of these materials, the Court finds that Settlement Class Counsel's application for fees and expenses is not defective for using unreasonable attorney rates or failing to itemize expenses.  (*See also* D.E. No. 436 ¶¶ 23-24 (showing, for each lawyer, the title, the position, years of experience, and the billing rate wherein the maximum billing rate was $750 per hour for three lawyers who each had over 20 years of experience)).

*Fourth*, the Court overrules Ms. Chandra's objections that attorney fees and expenses pursuing a medical monitoring class should be excluded.  Settlement Class Counsel dedicated 190 hours to medical monitoring and has no costs that can be attributed to medical monitoring exclusively.  (D.E. No. 436 ¶¶ 11-14).  It is true that a portion of Settlement Class Counsel's work included "investigation into the merit and viability of pursuing medical monitoring relief." (*Id.* ¶ 4).  Before removing relief relating to medical monitoring, Settlement Class Counsel "undertook a reasonable investigation of the facts, law and science in connection with the viability of this requested relief and in [their] pursuit of this potential form of relief."  (*Id.* ¶ 10).  But, after amending their complaint in January 2012, "no work whatsoever was performed on the issue of medical monitoring."  (*Id.*).

Settlement Class Counsel has submitted a declaration setting forth, among other things, these representations.  (*See also id.* ¶¶ 11-12 (detailing the method employed to review time and expense records relating to medical monitoring)).  Because medical monitoring appears to be a form of relief that was incidental to Plaintiffs' substantive causes of action, the Court will not exclude reimbursement for the requested 190 hours.  This is particularly so because the Court is not persuaded by Ms. Chandra's contention that the "proofs required to pursue medical

monitoring are different from the proofs required to prove loss of property value." (*See* D.E. No. 407 at 5).  For example, discovery into the migration of chemicals seems plainly relevant to Plaintiffs' substantive claims and the related medical monitoring relief.  (*See* 9/24/15 Tr. at 116:2-7 ("[O]f course you need doctors, but first you need to prove that there was exposure and you need to prove that it was a defendant's conduct that caused it and you need to prove that the chromium came from the defendant's manufacturing area, you need to prove liability.")).

*Fifth*, the Court is unpersuaded that Settlement Class Counsel wants Classes A and C to pay for litigation pursued against PPG for Class B.  (*See* D.E. No. 407 at 6-7).  Although settlement has been reached with Honeywell, Settlement Class Counsel was prosecuting this action against Honeywell and PPG jointly until it notified this Court that there was a settlement with Honeywell.  (D.E. No. 436 ¶ 31).  Settlement Class Counsel's theory and the realities of this case—for example, that the Defendants' waste was allegedly commingled, that there are allegations of joint and several liability, that there is a conspiracy claim, that court conferences didn't distinguish between Honeywell and PPG—does not reflect some nefarious intent to have Classes A and C subsidize Settlement Class Counsel's litigation against PPG.

And neither Ms. Chandra's research nor the Court's independent research seem to preclude such a fee award where there is a partial class action settlement—and the case involves joint and several liability allegations and discovery was intertwined between the settling and non-settling defendants.  Mindful of the Court's duty to function as a fiduciary for each Class affected by the Settlement, the Court is persuaded that the Classes' interests were served given Settlement Class Counsel's declaration that this "case was litigated in a manner such that all costs were advanced by the Class firms in their effort to prosecute the claims against Honeywell and PPG jointly."  (D.E. No. 436 ¶ 31).  Settlement Class Counsel's inability to parse out costs

attributable to each Defendant for activities such as attending court conferences and reviewing discovery *supports* that Settlement Class Counsel prosecuted this action against Defendants jointly.

To be sure, the Court's finding in this regard is made against the backdrop that: (a) no one but Ms. Chandra objected to Settlement Class Counsel's fee/costs application (whether in writing or at the Fairness Hearing); (b) Settlement Class Counsel has submitted a declaration that the majority of expenses incurred in pursuing claims against PPG were distinguishable *after* a settlement in principle was reached with Honeywell, and reimbursement is not sought for those PPG-only expenses, (D.E. No. 436 ¶¶ 29, 31-32); and (c) this is an environmental action in which Defendants' chromate waste was allegedly commingled and there is a civil conspiracy claim. Moreover, Settlement Class Counsel has convinced this Court—including through the use of *in camera* submissions—that the majority of case expenses became distinguishable after the settlement in principle[12] was reached with Honeywell such that Settlement Class Counsel does not seek reimbursement for those PPG-related expenses. (*See* D.E. No. 436 ¶¶ 32-34).

*Sixth*, the Court's review of *in camera* submissions refutes Ms. Chandra's concern that "neither the court nor the class can ascertain whether or not Class Counsel is double dipping by charging the class for attorney fees related to contract attorneys and also recovering those same expenses as a litigation expense." (*See* D.E. No. 407 at 8).

(3) The skill and efficiency of the attorneys involved

The "goal in percentage fee-award cases" is to "ensur[e] that competent counsel continue to be willing to undertake risky, complex, and novel litigation." *Gunter*, 223 F.3d at 198. This is a complex environmental class action. But there is little reason, if any, to doubt Settlement Class

---

[12] On July 15, 2014, Plaintiffs and Honeywell jointly wrote the Court that "Plaintiffs and Honeywell signed a term sheet that would result in settlement of Plaintiffs' claims against Honeywell." (D.E. No. 350).

Counsel has the requisite skill and experience to litigate an action such as this. Further, the Court required supplemental documentation from Settlement Class Counsel (as well as Honeywell) regarding certain issues, (*see, e.g.*, D.E. No. 428), and the Court notes the comprehensive and satisfactory nature of the submissions provided to the Court after the Fairness Hearing. *See Rowe v. E.I. DuPont de Nemours and Co.*, No. 06-1810, 2011 WL 3837106, at *19 (D.N.J. Aug. 26, 2011) ("In furtherance of its obligation to engage in extensive analysis and inquiry before determining a reasonable amount of fees, the Court required further submission from counsel explaining instances where multiple attorneys appeared on behalf of the class and clarifying billing entries. The Court has thoroughly reviewed these materials and is satisfied that counsel efficiently managed this litigation."). Moreover, reaching the Settlement—which nearly 60% of eligible members seek to benefit from—while facing formidable local and national counsel for Honeywell confirms that this factor weighs in favor of approval.

(4) <u>The complexity and duration of the litigation</u>

The Court has already reviewed the complexity of the legal issues and subject matter involved, as well as the duration of fact discovery and overall litigation. Given the relevant discussion elsewhere in this Opinion, as well as the absence of any objection to the complexity and duration of this litigation (whether for purposes of the first *Girsh* factor or the instant *Gunter* factor), the Court finds that this factor thus weighs in favor of approval.

(5) <u>The risk of nonpayment</u>

The risk of nonpayment concerns Settlement Class Counsel's prosecution of this action on a contingency fee basis. (*E.g.*, D.E. Nos. 397-1 at 15 & 397-2 ¶ 45). This *Gunter* factor takes accounts for non-payment in that context. *See, e.g.*, *Saini*, 2015 WL 2448846, at *18 ("Class counsel undertook this action on a contingent fee basis, assuming a substantial risk that they

might not be compensated for their efforts. Courts recognize the risk of non-payment as a major factor in considering an award of attorney fees.") (citation omitted); *In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d at 339 ("[T]he chief risk of nonpayment in this case arose from Derivative Plaintiff's counsel's acceptance of the case on a contingency-fee basis."). The Court finds that Settlement Class Counsel's investment of a substantial effort and resources in prosecuting this action and obtaining this Settlement—on a contingency fee basis—weighs in favor of approval.

(6) <u>The amount of time devoted to the case by plaintiffs' counsel</u>

Collectively, Settlement Class Counsel dedicated over 27,000 hours to this case. (D.E. No. 397-2 ¶ 40). This is figure is confirmed by the *in camera* submissions of detailed time records provided to the Court, which the Court has carefully reviewed. (*See* D.E. No. 430; D.E. No. 436 ¶ 19). Based on the amount of time expended on this matter, this factor weighs in favor of approval.

(7) <u>The awards in similar cases</u>

This factor asks the Court to look at awards in similar cases when assessing the reasonableness of a fee request. *See Gunter*, 223 F.3d at 195 n.1. "This factor is addressed in two ways: a court (1) compares the actual award requested to other awards in comparable settlements; and (2) ensures that the award is consistent with what an attorney would have likely received if the fee was negotiated on the open market." *Rowe*, 2011 WL 3837106, at *21 (citation and quotation marks omitted).

"In common fund cases, a district judge can award attorneys' fees as a percentage of the fund recovered," and the Third Circuit has observed that "fee awards have ranged from nineteen percent to forty-five percent of the settlement fund." *GM Truck Prods.*, 55 F.3d at 822. And

"[m]any courts, including several in the Third Circuit, have considered 25% to be the benchmark figure for attorney fee awards in class action lawsuits, with adjustments up or down for significant case-specific factors." *Varacallo*, 226 F.R.D. at 249 (citation and quotation marks omitted); *see also In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 155 (D.N.J. 2013) ("Courts within the Third Circuit often award fees of 25% to 33% of the recovery.").

Here, whether it be about 25% or about 28%, the Court finds that the fee-request is satisfactory in light of the fees typically awarded in this Circuit and the fees typically awarded in environmental cases such as this one. *See, e.g.*, *Rowe*, 2011 WL 3837106, at *17-23; *Martin v. Foster Wheeler Energy Corp.*, No. 06-0878, 2008 WL 906472 (M.D. Pa. Mar. 31, 2008) (explaining that the litigation was "complex, expensive, and likely to last a long amount of time" because of "the nature of pollution" and, further, that "there [were] complicated issues of fact and science" that "would require extensive discovery and scientific evidence, requiring the Plaintiffs to prove that the Defendant was the source of the [contaminant], that Plaintiffs' property was decreased in value, among other liability concerns").

Accordingly, the Court finds that the requested percentage has been found acceptable in such common-fund settlements in this Circuit and, further, that the requested percentage falls within the range of privately negotiated contingent fees. *See In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. at 156-57 (collecting cases).

(8)-(10) The *Prudential* Factors

Two of the last three *Prudential* factors also weigh in favor of approval of Settlement Class Counsel's fee request. *First*, the benefits to eligible members from Classes A & C are attributable to Settlement Class Counsel's efforts. Although there have been numerous government investigations and attempts by administrative agencies to address the contamination

in Jersey City, this Settlement will result in actual money payments—which has not occurred from the investigations and administrative agency efforts.  *Second*, as discussed, the percentage requested (i.e., whether about 25% or about 28%) is consistent with what Settlement Class Counsel would have negotiated as a contingent fee in the marketplace at the outset of litigation.  *Third*, although the parties contemplated a *cy pres* community project whereby up to $100,000 of unclaimed funds would be used, the parties have since withdrawn this provision from the Settlement Agreement.  (*See* D.E. No. 417 at 1; *see also* 9/24/15 Tr. at 16:25-18:5, 63:17-64:17).  Accordingly, the Court finds that there are no proposed innovative terms that would weigh in favor (or against) approval.  (*See* D.E. No. 397-1 at 20 (initially contending that the community project weighed favorably as a *Prudential* factor)).

### B.  Lodestar Cross-Check

"The lodestar method can be used to cross-check the reasonableness of a percentage-of-recovery fee award."  *Sullivan*, 667 F.3d at 330; *see also In re A T & T Corp.,* 455 F.3d at 164 ("[W]e have recommended that district courts use the lodestar method to cross-check the reasonableness of a percentage-of-recovery fee award.").  "The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys."  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 305.  "The reasonable attorney rate is determined by reference to the marketplace."  *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. at 157.

After determining the lodestar, the Court should divide the fee request by the lodestar to arrive at a multiplier.  *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 305-06; *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. 08-2177, 2013 WL 5505744, at *33 (D.N.J. Oct. 1, 2013).

"In performing the lodestar cross-check, the district courts should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 306.

Notably, "[t]he lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." *Id.* To be sure, "[e]ven when used as a cross-check, courts should 'explain how the application of a multiplier is justified by the facts of a particular case.'" *Id.* (quoting *In re Prudential*, 148 F.3d at 340-41)). Finally, in using the lodestar cross-check, "the district court may rely on summaries submitted by counsel and need not review billing records." *In re Schering-Plough Corp. Enhance Sec. Litig.*, 2013 WL 5505744, at *33.

Here, Settlement Class Counsel submits that the total number of hours expended by attorneys and paraprofessionals involved in this case is 27,638.70 hours—which is rounded for purposes of the cross-check to 27,639 hours. (D.E. No. 436 ¶¶ 24-25). Settlement Class Counsel submits a blended billing rate of $342.11 per hour. (*Id.*). This yields a lodestar of $9,455,475.66. (*Id.*).[13] Settlement Class Counsel seeks $2,504,250 in fees. (*Id.*). Dividing $2,504,250 by $9,455,475.66 yields a multiplier of 0.26.

The Court finds that this lodestar multiplier of 0.26 is reasonable and appropriate. *First*, the Court has reviewed *in camera* the hours that were expended in pursing this litigation and is satisfied that submitted number of 27,638.70 hours is accurate. (D.E. No. 430; D.E. No. 436 ¶ 19). *Second*, the Court is satisfied that the blended rate of $342.11 per hour is satisfactory. The

---

[13] Settlement Class Counsel's submission states that the lodestar is $9,455,465.66, (D.E. No. 436 ¶¶ 24-25), but this appears to be a typographical error that doesn't change the outcome of the Court's lodestar cross-check. In fact, using either lodestar results in the same multiplier.

calculation to arrive at this figure is provided in Settlement Class Counsel's declaration.  (D.E. No. 436 ¶ 24).

And, regarding the issue of using the blended rate, the Court overrules Ms. Chandra's objection that the "submission of a 'blended rate' is useless because it . . . prohibits the court form making a determination as to the reasonableness of the rates charged by each attorney." (*See* D.E. No. 407 at 12).  "In performing the lodestar cross-check, the district courts *should* apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter."  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 306 (emphasis added).[14]  After all, Ms. Chandra's hypothetical that a lawyer's rates may be excessive—and therefore improperly inflate the blended rate—is belied by Settlement Class Counsel's declaration.  (D.E. No. 436 ¶¶ 23-24 (showing, for each lawyer, the title, the position, years of experience, and the billing rate wherein the maximum billing rate was $750 per hour for three lawyers who each had over 20 years of experience)).  The Court finds that the hourly billable rates are reasonable in light of the marketplace.  *See, e.g.*, *Saini*, 2015 WL 2448846, at *19; *In re Merck & Co. Vytorin ERISA Litig.*, No. 08-285, 2010 WL 547613, at *12-13 (D.N.J. Feb. 9, 2010).

## C.  Costs

"Counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case."  *In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d at 343.  Here, Settlement Class Counsel seeks $1,140,023.77 in costs.  (D.E. No. 431).  This sum is comprised of: (1) $1,085,869.58 in costs for pursuing claims against both PPG and Honeywell; and (2) $54,154.19

---

[14] *See also In re Schering-Plough Corp. Enhance Sec. Litig.*, 2013 WL 5505744, at *33 ("[T]he putative POR award is divided by the lodestar (which consists of the value of billable time devoted to the case calculated by multiplying the total hours submitted by counsel by the blended current billing rates of all attorneys and paraprofessionals who worked on the case).").

in expenses attributable to Honeywell only.   (D.E. No. 436 ¶ 29).   Settlement Class Counsel

submitted documentation of its expenses for *in camera* review.   (D.E. Nos. 431 & 436 ¶ 29).

> The expenses included the following:

> > fees for experts or consultants in various scientific disciplines such as air transport of contaminants, risk assessment, forensic reconstruction, toxicology, property valuation and economics; mediation fees and costs; the costs associated with document management, reviews, imaging, copying, Bates labeling and productions; the costs associated with fact and legal research; forensic preservation of electronic files; court fees such as the filing of pleadings, subpoena service and *pro hac vice fees*; discovery such as deposition transcripts and videos; litigation support costs associated with copying, uploading, and analyzing voluminous data and document collections and costs associated with travel and lodging for hearings, client meetings, expert meetings, site visits, court conferences, co-counsel meetings, document reviews, mediation and meetings with opposing counsel.

(D.E. No. 436 ¶ 30).

Settlement Class Counsel reiterates that, although settlement has been reached only with

Honeywell, they litigated this case "in a manner such that all costs were advanced by the Class

firms in their effort to prosecute the claims against Honeywell and PPG jointly" as "this case

involved numerous allegations of joint and several liability."   (*Id.* ¶ 31).   But "[o]nce a settlement

in principle was reached, . . . the majority of case expenses, such as expert expenses, were

incurred in pursuing plaintiffs' claims against PPG and were distinguishable," and Settlement

Class Counsel "have isolated these expenses and do not seek reimbursement of those costs from

the Honeywell settlement fund."   (*Id.* ¶ 32).   Settlement Class Counsel has also "isolated certain

Honeywell-only expenses, such as the costs associated with the mediation and settlement."   (*Id.* ¶

33).

The Court finds that Settlement Class Counsel is entitled to receive costs in the requested

amount because the requested costs have been "adequately documented and reasonably and

appropriately incurred in the prosecution of the case." *See In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d at 343.  Importantly, Settlement Class Counsel has provided this Court with itemized expenditures, including *in camera* submissions showing detailed records of the requested costs.

To be sure, for the reasons discussed above under the second *Gunter* factor, the Court is not persuaded otherwise by Ms. Chandra's objections.  (*See* D.E. No. 407 at 4, 6, 8, 9 (objecting that medical-monitoring expenses should be excluded, PPG-related expenses should be excluded, contract-attorney expenses are being charged twice, and expenses have not been itemized)).

**D.  Incentive awards**

"Incentive awards are not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the entire class." *Sullivan*, 667 F.3d at 333 n.65 (citation omitted).  "The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *Id.* (citation and quotation marks omitted).  Here, Settlement Class Counsel seeks permission to pay each representative for Classes A and C $10,000 from the common fund.  (*See* D.E. No. 415-3 at 20).

The Court approves these two awards.  *First*, these awards are not conditioned on the individuals' support for the settlement; they are for compensating the two representatives for their services, including spending considerable time communicating with counsel and other class members, as well as appearing "for lengthy and sometimes difficult and emotional multi-day deposition."  (D.E. No. 397-2 ¶ 37); *see also Bredbenner v. Liberty Travel, Inc.*, No. 09-905, 2011 WL 1344745, at *23 (D.N.J. Apr. 8, 2011) ("Courts have ample authority to award

incentive or 'service' payments to particular class members where the individual provided a benefit to the class or incurred risks during the course of litigation."). *Second*, the award amounts are neither excessive (viewing them in a vacuum) nor disproportionally large when compared to the payments to individual class members. *Third*, no one has objected to the incentive awards even though there was unequivocal notice about the awards being withdrawn from the common fund. (*See* D.E. No. 415-4 at 18, 29).

## VII.  CONCLUSION

For the reasons in this Opinion, the Court certifies two classes for purposes of settlement, approves the proposed settlement, approves the requested attorney's fees and costs, and approves the class representative incentive awards.  An appropriate Order accompanies this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**